**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Julio PICCINONNA,**
**Defendant–Appellant.**

**No. 86–5335.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 28, 1989.

James W. McDonald, Jr., McDonald & Erickson, P.A., Homestead, Fla., for defendant-appellant.

Dexter W. Lehtinen, U.S. Atty., Caroline Heck, Asst. U.S. Atty., Miami, Fla., John J. Powers, III and Laura Heiser, Dept. of Justice, Main Appellate Section, Washington, D.C., James Griffin, U.S. Dept. of Justice, Anti Trust Div., Atlanta, Ga., for plaintiff-appellee.

Before RONEY, Chief Judge, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON and COX, Circuit Judges.

FAY, Circuit Judge:

In this case, we revisit the issue of the admissibility at trial of polygraph expert testimony and examination evidence. Julio Piccinonna appeals his conviction on two counts of knowingly making false material statements to a Grand Jury in violation of Title IV of the Organized Crime Control Act of 1970. 18 U.S.C. 1623 (1982). Piccinonna argues that the trial judge erred in refusing to admit the testimony of his polygraph expert and the examination results. Because of the significant progress made in the field of polygraph testing over the past forty years and its increasingly widespread use, we reexamine our per se rule of exclusion and fashion new principles to govern the admissibility of polygraph evidence. Accordingly, we remand the case to the trial court to reconsider the admissibility of Piccinonna's polygraph test results in light of the principles we espouse today.

## I. Background

Julio Piccinonna has been in the waste disposal business in South Florida for over twenty-five years. In 1983, a Grand Jury conducted hearings to investigate antitrust violations in the garbage business. The government believed that South Florida firms in the waste disposal business had agreed not to compete for each other's accounts, and to compensate one another when one firm did not adhere to the agreement and took an account from another firm.

Piccinonna was compelled to testify before the Grand Jury pursuant to a grant of immunity. The immunity, however, did not protect Piccinonna from prosecution for perjury committed during his testimony. Piccinonna testified that he had not heard of the agreement between garbage companies to refrain from soliciting each other's accounts and to compensate each other for taking accounts. The Grand Jury, however, also heard testimony from several witnesses involved in the disposal industry who implicated Piccinonna in the garbage industry agreement. On August 1, 1985, Piccinonna was indicted on four counts of perjury.

Prior to trial, Piccinonna requested that the Government stipulate to the admission into evidence of the results of a polygraph test which would be administered subsequently. The Government refused to stipulate to the admission of any testimony regarding the polygraph test or its results. Despite the Government's refusal, George B. Slattery, a licensed polygraph examiner, tested Piccinonna on November 25, 1985. Piccinonna asserted that the expert's report left no doubt that he did not lie when he testified before the Grand Jury. (R1–38–2). On November 27, 1985, Piccinonna filed a motion with the district court requesting a hearing on the admission of the polygraph testimony.[1] On January 6, 1986, the district court held a hearing on the defendant's motions. Due to the per se rule, which holds polygraph evidence inadmissible in this circuit, the trial judge refused to admit the evidence. The judge noted, however, that the Eleventh Circuit may wish to reconsider the issue of the admissibility of polygraph evidence since these tests have become much more widely used, particularly by the Government.

---

**1.** Piccinonna also filed a motion for a *James* hearing to determine whether the hearsay statements of the alleged co-conspirators were admissible in evidence against him, and a motion to incorporate by reference the transcript of an evidentiary hearing on the admissibility of polygraph tests held in the case of *United States v. Irvin Freedman, et al.,* Case No. 81–434–CR–AR-ONOVITZ.

Hence, the judge stated that if Piccinonna was convicted, the court would conduct a post-trial hearing to perfect the record for appeal.

Piccinonna was convicted on two counts of making false material declarations concerning a matter the Grand Jury was investigating. The court then conducted a hearing to perfect the record for appeal. At the hearing, the judge ordered the report of the polygraph examination and the complete transcript of the evidentiary hearing conducted in *United States v. Irwin Freedman*, No. 81–434–CR–ARONOVOTZ to become part of the record. On appeal, Piccinonna urges us to modify our per se rule excluding polygraph evidence to permit its admission in certain circumstances.

## II. The Per Se Rule

In federal courts, the admissibility of expert testimony concerning scientific tests or findings is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Under this rule, to admit expert testimony the trial judge must determine that the expert testimony will be relevant [2] and will be helpful to the trier of fact.[3] In addition, courts require the proponent of the testimony to show that the principle or technique is generally accepted in the scientific community. McCormick, *McCormick on Evidence* § 203 (3rd ed. 1984).

The general acceptance requirement originated in the 1923 case of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *Frye* involved a murder prosecution in which the trial court refused to admit results from a systolic blood pressure test, the precursor of the polygraph. The defendant appealed, arguing that the admissibility of the scientific test results should turn only on the traditional rules of relevancy and helpfulness to the trier of fact. The court of appeals disagreed and imposed the requirement that the area of specialty in which the court receives evidence must have achieved general acceptance in the scientific community. *Id.* 293 F. at 1014. The court stated that "while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* The court concluded that the systolic blood pressure test lacked the requisite "standing and scientific recognition among physiological and psychological authorities." *Id.*

Courts have applied the *Frye* standard to various types of scientific tests, including the polygraph.[4] However, the *Frye* standard has historically been invoked only selectively to other types of expert testimony, and has been applied consistently only in cases where the admissibility of polygraph evidence was at issue. *See* McCormick, *Scientific Evidence: Defining a New Approach to Admissibility* 67 Iowa L.Rev. 879, 884 (1982).[5] Most courts had little difficulty with the desirability of excluding polygraph evidence and thus, applied the *Frye* standard with little comment. *Id.* at 885. This circuit also has consistently re-

---

**2.** *See* Fed.R.Evid. 401, 403.

**3.** *See e.g.* Fed.R.Evid. 702.

**4.** For the next fifty years, the *Frye* holding acted as a complete bar to the admissibility of polygraph evidence. *Kaminski v. State,* 63 So.2d 339, 340 (Fla.1952); *Boeche v. State,* 151 Neb. 368, 377, 37 N.W.2d 593, 597 (1949); *Henderson v. State,* 94 Okl.Cr. 45, 52–55, 230 P.2d 495, 502–505, *cert. denied* 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673 (1951). For brief history of poly-

graph admissibility *see State v. Valdez,* 91 Ariz. 274, 371 P.2d 894, 896 n. 4 (1962).

**5.** *See* also Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later,* 80 Colum.L.Rev. 1197, 1219–21 (1980); *Reed v. State,* 283 Md. 374, 391 A.2d 364, 403 (1978) (Smith, J., dissenting) (*Frye* standard has generally not been relied upon for the admission of evidence such as fingerprints, ballistics, intoxication tests, and X-rays).

affirmed, with little discussion, the inadmissibility of polygraph evidence. *United States v. Hilton,* 772 F.2d 783, 785 (11th Cir.1985); *United States v. Rodriguez,* 765 F.2d 1546, 1558 (11th Cir.1985); *cf. United States v. Beck,* 729 F.2d 1329, 1332 (11th Cir.) (court implied that polygraph evidence may be admissible when the parties stipulate to its admissibility), *cert. denied,* 469 U.S. 981, 105 S.Ct. 383, 83 L.Ed.2d 318 (1984). Our position was derived from former Fifth Circuit precedent excluding polygraph evidence, which we adopted as law in this circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981).[6]

Recently, the application of the *Frye* standard to exclude polygraph evidence has been subject to growing criticism.[7] Since the *Frye* decision, tremendous advances have been made in polygraph instrumentation and technique.[8] Better equipment is being used by more adequately trained polygraph administrators. Further, polygraph tests are used extensively by government agencies. Field investigative agencies such as the FBI, the Secret Service, military intelligence and law enforcement agencies use the polygraph. Thus, even under a strict adherence to the traditional *Frye* standard, we believe it is no longer accurate to state categorically that polygraph testing lacks general acceptance for use in all circumstances. For this reason, we find it appropriate to reexamine the per se exclusionary rule and institute a rule more in keeping with the progress made in the polygraph field.

### III. Differing Approaches to Polygraph Admissibility

Courts excluding polygraph evidence typically rely on three grounds: 1) the unreliability of the polygraph test,[9] 2) the lack of standardization of polygraph procedure,[10] and 3) undue impact on the jury.[11] Proponents of admitting polygraph evidence have

---

**6.** In *United States v. Clark,* 598 F.2d 994, 995 (5th Cir.1979), the Fifth Circuit reaffirmed its former holdings excluding polygraph evidence. However, in a per curiam opinion vacating an order which had granted rehearing of the case *en banc,* twelve judges agreed in a concurrence that had a proffer of evidence been made tending to show advances in polygraph testing, the issue would properly be subject to reconsideration. *United States v. Clark,* 622 F.2d 917 (5th Cir.1980), *cert. denied,* 449 U.S. 1128, 101 S.Ct. 949, 67 L.Ed.2d 116 (1981).

**7.** Commentators have consistently criticized application of the *Frye* standard. Some commentators advocate a requirement of substantial acceptance as an alternative to the general acceptance standard. J. Richardson, *Modern Scientific Evidence* § 2.5 at 24 (2d ed.1974). Other commentators question the necessity for any special rules governing the admissibility of scientific evidence and believe that the concerns of *Frye* proponents could be met with careful application of traditional rules regarding relevancy and expert testimony. *See e.g.* Trautman, *Logical or Legal Relevancy—A Conflict in Theory,* 5 Vand.L.Rev. 385, 396 (1952). Professor McCormick agreed with this approach stating that "[g]eneral scientific acceptance is a proper condition for taking judicial notice of scientific facts, but it is not a suitable criterion for the admissibility of scientific evidence. Any relevant conclusions supported by a qualified expert witness should be received unless there are distinct reasons for exclusion. These reasons are the familiar ones of prejudicing or misleading the jury or consuming undue amounts of time." *McCormick on Evidence, supra* § 203 at 608

(footnotes omitted). Dean Wigmore concurs with McCormick's standard for admission of polygraph evidence. Wigmore, *Evidence,* § 990 (3d ed.1940).

**8.** Barland, Raskin, *"Detection of Deception," Electro–Dermal Activity in Psychological Research* (1973); Barland, Raskin, *An Evaluation of Field Techniques in the Detection of Deception,* 12 Psychophysiology 321 (1975); Podlesny, Raskin, *Effectiveness of Techniques and Physiological Measurers in the Detection of Deception,* 15 Psychophysiology 344 (1978).

**9.** *United States v. Gloria,* 494 F.2d 477, 483 (5th Cir.), *cert. denied,* 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974); *United States v. Skeens,* 494 F.2d 1050, 1053 (D.C.Cir.1974); *People v. Anderson,* 637 P.2d 354, 358 (Col.1981); *People v. Baynes,* 88 Ill.2d 225, 230, 58 Ill.Dec. 819, 824, 430 N.E.2d 1070, 1075 (1981); *State v. Grier,* 307 N.C. 628, 300 S.E.2d 351, 360 (1983); *Fulton v. State,* 541 P.2d 871, 872 (Okla.1975).

**10.** *People v. Anderson,* 637 P.2d 354, 358 (Col. 1981); *People v. Baynes,* 88 Ill.2d 225, 58 Ill.Dec. 819, 824, 430 N.E.2d 1070, 1075 (1981); *State v. Grier,* 307 N.C. 628, 300 S.E.2d 351, 360 (1983); *State v. Dean,* 103 Wis.2d 228, 307 N.W.2d 628, 633 (1981); *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974).

**11.** *United States v. Alexander,* 526 F.2d 161 (8th Cir.1975); *United States v. Jenkins,* 470 F.2d 1061, 1064 (9th Cir.1972), *cert. denied,* 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973); *People v. Anderson,* 637 P.2d 354, 358 (Col.1981); *Peo-*

attempted to rebut these concerns. With regard to unreliability, proponents stress the significant advances made in the field of polygraphy.[12] Professor McCormick argues that the fears of unreliability "are not sufficient to warrant a rigid exclusionary rule. A great deal of lay testimony routinely admitted is at least as unreliable and inaccurate, and other forms of scientific evidence involve risks of instrumental or judgmental error." McCormick, *supra,* § 206 at 629. Further, proponents argue that the lack of standardization is being addressed and will progressively be resolved as the polygraph establishes itself as a valid scientific test. Sevilla, *Polygraph 1984: Behind the Closed Door of Admissibility,* 16 U. West L.A.L.Rev. 5, 19 (1984).[13] Finally, proponents argue that there is no evidence that jurors are unduly influenced by polygraph evidence. *Id.* at 17. In fact, several studies refute the

proposition that jurors are likely to give disproportionate weight to polygraph evidence.[14]

In the wake of new empirical evidence and scholarly opinion which have undercut many of the traditional arguments against admission of polygraph evidence, a substantial number of courts have revisited the admissibility question. Three roughly identifiable approaches to the problem have emerged. First, the traditional approach holds polygraph evidence inadmissible when offered by either party, either as substantive evidence or as relating to the credibility of a witness. McCormick, *supra,* section 206 at 628.[15] Second, a significant number of jurisdictions permit the trial court, in its discretion, to receive polygraph evidence if the parties stipulate to the evidence's admissibility before the administration of the test and if certain other conditions are met.[16] Finally, some courts

*ple v. Baynes,* 88 Ill.2d 225, 58 Ill.Dec. 819, 828, 430 N.E.2d 1070, 1079 (1981); *State v. Grier,* 307 N.C. 628, 300 S.E.2d 351, 360 (1983); *State v. Dean,* 103 Wis.2d 228, 307 N.W.2d 628 (1981); *State v. Stanislawski,* 62 Wis.2d 730, 216 N.W.2d 8 (1974).

**12.** Polygraph examiners contend that a properly administered polygraph test is a highly effective way to detect deception and cite figures between 92% and 100% for its accuracy. McCormick, *supra,* § 206 at 626. Others suggest figures in the range of 63—72%. *Id.*

**13.** For instance, Sevilla points out that experts in the polygraph field have developed detailed standards for administration of polygraph tests. The American Polygraph Association and state organizations have standards in their charters which members must follow as well. *See* Sevilla, *supra* at 19.

**14.** Carlson, Pasano & Jannunzzo, *The Effect of Lie Detector Evidence on Jury Deliberations: An Empirical Study,* 5 J. Pol. Sci. & Admin. 148; Markwart & Lynch, *The Effect of Polygraph Evidence on Mock Jury Decision–Making,* 7 J. Pol. Sci. & Admin. 324 (1979); Peters, *A Survey of Polygraph Evidence in Criminal Trials,* 68 A.B.A. J. 162, 165 (1982) (citing cases in which the jury verdict in criminal trials was at odds with the testimony of the polygraph examiner.)

**15.** *United States v. Brevard,* 739 F.2d 180 (4th Cir.1984); *De Vries v. St. Paul Fire & Marine Insurance Co.,* 716 F.2d 939, 945 (1st Cir.1983); *Smith v. Gonzales,* 670 F.2d 522, 528 (5th Cir.), *cert. denied,* 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982); *United States v. Zeiger,* 475 F.2d 1280 (D.C.Cir.1972); *United States v. Bando,* 244 F.2d 833, 841 (2nd Cir.), *cert. denied,* 355

U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957); *Pulakis v. State,* 476 P.2d 474, 479 (Alaska 1970); *People v. Anderson,* 637 P.2d 354, 358 (Colo. 1981); *People v. Baynes,* 88 Ill.2d 225, 58 Ill.Dec. 819, 430 N.E.2d 1070 (1981); *Kelley v. State,* 288 Md. 298, 418 A.2d 217, 219 (1980); *State v. Mitchell,* 402 A.2d 479, 482 (Me.1979); *State v. Biddle,* 599 S.W.2d 182, 185 (Mo.1980); *State v. Steinmark,* 195 Neb. 545, 239 N.W.2d 495, 497 (1976); *Birdsong v. State,* 649 P.2d 786, 788 (Okl.Cr.1982); *State v. Frazier,* 162 W.Va. 602, 252 S.E.2d 39, 49 (1979); *State v. Dean,* 103 Wis.2d 228, 307 N.W.2d 628 (1981).

**16.** *Anderson v. United States,* 788 F.2d 517, 519 (8th Cir.1986) (for purposes of prosecution's duty to reveal favorable evidence to accused, review of polygraph statements in camera proper in determining whether the statements were material to guilt or punishment); *State v. Valdez,* 91 Ariz. 274, 283–84, 371 P.2d 894, 900 (1962) (In court's discretion polygraph evidence may be admitted pursuant to signed stipulation. Opposing side is entitled to broad cross-examination and limiting instruction to the jury as to the evidentiary purpose of the testimony); *State v. Bullock,* 262 Ark. 394, 557 S.W.2d 193 (1977) (where there is dispute as to existence of stipulation, polygraph evidence admissible only if parties have executed a written agreement); *People v. Trujillo,* 67 Cal.App.3d 547, 136 Cal.Rptr. 672, 676 (5th Dist.1977) (results of polygraph may be admitted pursuant to a stipulation by both parties provided that the stipulation was not entered into as a result of fraud, excusable neglect, misrepresentation, or mistake of fact, and further provided that the facts have not changed and there are no other special circumstances

permit the trial judge to admit polygraph evidence even in the absence of a stipulation, but only when special circumstances exist.[17] In these jurisdictions, the issue is within the sound discretion of the trial judge.

Relying on the typical grounds to exclude polygraph evidence, the Fourth, Fifth and District of Columbia Circuits historically have adhered to the traditional approach of per se inadmissibility. *United States v. Brevard*, 739 F.2d 180 (4th Cir.1984); *United States v. Clark*, 598 F.2d 994, 995 (5th Cir.1979), vacated *en banc* 622 F.2d 917 (1980), *cert. denied*, 449 U.S. 1128, 101 S.Ct. 949, 67 L.Ed.2d 116 (1981); *United States v. Skeens*, 494 F.2d 1050, 1053 (D.C. Cir.1974). While these circuits have sometimes hinted at the possibility of adopting a more liberal approach, they have consistently returned to per se inadmissibility. *See e.g. United States v. Webster*, 639 F.2d 174, 186 (4th Cir.) (admissibility of polygraph evidence can be within discretionary powers of trial judge), *cert. denied, Christian v. United States* (1981), *modified in other respects* 669 F.2d 185 (4th Cir.), *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982); *United States v. Brevard*, 739 F.2d 180 (4th Cir.1984) (per se inadmissible); *United States v. Clark*, 622

F.2d 917, 917 (5th Cir.1980) (twelve concurring judges agreed that the per se rule should be reconsidered), *cert. denied*, 449 U.S. 1128, 101 S.Ct. 949, 67 L.Ed.2d 116 (1981); *Tyler v. United States*, 193 F.2d 24 (D.C.Cir.1951), *cert. denied*, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952) (not error for trial court to admit polygrapher's testimony for purpose of deciding whether the defendant's confession was voluntary); *United States v. Skeens*, 494 F.2d at 1053 (D.C.Cir.1974) (polygraph evidence per se inadmissible).

The Eighth Circuit has developed a more liberal approach which allows admission of polygraph evidence only when the parties stipulate. *Anderson v. United States*, 788 F.2d 517, 519 (8th Cir.1986); *United States v. Alexander*, 526 F.2d 161, 166 (8th Cir. 1975). However, another line of Eighth Circuit cases appears to be more permissive in allowing the introduction of polygraph evidence. *United States v. Yeo*, 739 F.2d 385, 388 (8th Cir.1984); *United States v. Oliver*, 525 F.2d 731, 736 (8th Cir.1975) (a discretionary rather than a per se exclusionary rule is appropriate). Hence, while the Eighth Circuit falls within the second category, it appears to be leaning toward greater admissibility of polygraph evidence.

---

rendering it unjust to enforce the stipulation); *Codie v. State*, 313 So.2d 754, 756 (Fla.1975) (stipulation need not be in writing if defendant freely and voluntarily submitted to taking polygraph examination); *Pavone v. State*, 273 Ind. 162, 402 N.E.2d 976, 978–79 (1980) (even if the parties enter into a written stipulation, court still retains discretion to deny admission of polygraph results); *State v. Marti*, 290 N.W.2d 570, 586–87 (Iowa 1980) (stipulation must be agreed to by both parties, should be a matter of record, and polygraph may be admitted only in the proceeding for which stipulation was intended); *State v. Roach*, 223 Kan. 732, 576 P.2d 1082, 1086 (1978) (polygraph evidence admissible if both parties stipulate, the stipulation is a matter of record, defendant knowingly and voluntarily consents to the examination, counsel and defendant stipulate that results are to be admissible, the trial court is satisfied that the examiner is qualified and the examination is conducted under the proper conditions, and the opposing party is given adequate opportunity to cross-examine the polygraph examiner on his qualifications and the limitations of polygraph interrogation); *State v. Souel*, 53 Ohio St.2d 123, 134, 372 N.E.2d 1318, 1323–24 (1978) (adopts

*Valdez* rule); *Cullin v. State*, 565 P.2d 445, 457 (Wyo.1977) (in addition to stipulation by both parties, trial court must require a showing of the reliability and acceptance of the polygraph and allow cross-examination before admitting polygraph evidence).

**17.** *United States v. Miller*, 874 F.2d 1255 (9th Cir.1989); *United States v. Johnson*, 816 F.2d 918, 923 (3rd Cir.1987); *Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988); *United States v. Hall*, 805 F.2d 1410 (10th Cir. 1986); *United States v. Webster*, 639 F.2d 174, 186 (4th Cir.) (trial judge has broad discretion to admit polygraph evidence), *cert. denied, Christian v. United States*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), *modified in other respects* 669 F.2d 185, *cert. denied*, 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982); *State v. Dorsey*, 88 N.M. 184, 539 P.2d 204 (1975) (polygraph evidence admissible if polygraph expert is qualified as an expert, the testing procedure is shown reliable as approved by authorities in the field, and the tests made on the subject are shown to be valid).

Finally, the Third, Sixth, Seventh, Ninth and Tenth Circuits, and the Court of Military Appeals permit admission of polygraph evidence even in the absence of a stipulation when special circumstances exist. The Third and Seventh Circuits permit polygraph evidence to be introduced for the purpose of rebutting a claim by the defendant that his confession was the result of coercion. *United States v. Johnson*, 816 F.2d 918, 923 (3rd Cir.1987); *United States v. Kampiles*, 609 F.2d 1233, 1245 (7th Cir. 1979), *cert. denied*, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). The Tenth Circuit has permitted the government to introduce the fact that the defendant failed a polygraph test to explain why the police detective had not conducted a more thorough investigation. *United States v. Hall*, 805 F.2d 1410 (10th Cir.1986). In its attempt to mitigate the potential problems with polygraph evidence, the Sixth Circuit has promulgated a two-step approach to admission. *Wolfel v. Holbrook*, 823 F.2d 970 (6th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988). "First, the trial court must determine if the proffered evidence is relevant. Second, if the court concludes that the proffered evidence is relevant, it must balance the probative value of the evidence against the hazard of unfair prejudice and/or confusion which could mislead the jury." *Id.* at 972. The Ninth Circuit holds polygraph evidence admissible only in instances narrowly tailored to limit the prejudicial impact of the evidence. *United States v. Miller*, 874 F.2d 1255, 1262 (9th Cir.1989). The *Miller* court, in considering prior Ninth Circuit cases on this issue, noted that polygraph evidence might be admissible if it is "introduced for a limited purpose that is unrelated to the substantive correctness of the results of the polygraph examination." *Id.* at 1261. In *United States v. Bowen*, 857 F.2d 1337, 1341 (9th Cir.1988), the court held that if "the polygraph evidence is being introduced because it is relevant that a polygraph examination was given, regardless of the result, then it may be admissible ..." *Id.* at 1341.

The common thread running through the various approaches taken by courts which have modified the per se rule is a recognition that while wholesale exclusion under rule 702 is unwarranted, there must be carefully constructed limitations placed upon the use of polygraph evidence in court. Absent a stipulation by the parties, we are unable to locate any case in which a court has allowed polygraph expert testimony offered as substantive proof of the truth or falsity of the statements made during the polygraph examination. The myriad of "special circumstances" and conditions that have been held to constitute appropriate scenarios for use of polygraph evidence are necessarily rough estimates by the courts of when and where the danger of unfair prejudice due to the admission of the evidence is least significant.

## IV.  Principles for Admissibility

■ There is no question that in recent years polygraph testing has gained increasingly widespread acceptance as a useful and reliable scientific tool. Because of the advances that have been achieved in the field which have led to the greater use of polygraph examination, coupled with a lack of evidence that juries are unduly swayed by polygraph evidence, we agree with those courts which have found that a per se rule disallowing polygraph evidence is no longer warranted. Of course, polygraphy is a developing and inexact science, and we continue to believe it inappropriate to allow the admission of polygraph evidence in all situations in which more proven types of expert testimony are allowed. However, as Justice Potter Stewart wrote, "any rule that impedes the discovery of truth in a court of law impedes as well the doing of justice." *Hawkins v. United States*, 358 U.S. 74, 81, 79 S.Ct. 136, 140, 3 L.Ed.2d 125 (1958) (concurring). Thus, we believe the best approach in this area is one which balances the need to admit all relevant and reliable evidence against the danger that the admission of the evidence for a given purpose will be unfairly prejudicial. Accordingly we outline two instances where polygraph evidence may be admitted at trial, which we believe achieve the necessary balance.

## A. *Stipulation*

■ The first rule governing admissibility of polygraph evidence is one easily applied. Polygraph expert testimony will be admissible in this circuit when both parties stipulate in advance as to the circumstances of the test and as to the scope of its admissibility. The stipulation as to circumstances must indicate that the parties agree on material matters such as the manner in which the test is conducted, the nature of the questions asked, and the identity of the examiner administering the test. The stipulation as to scope of admissibility must indicate the purpose or purposes for which the evidence will be introduced. Where the parties agree to both of these conditions in advance of the polygraph test, evidence of the test results is admissible.

## B. *Impeachment or Corroboration*

■ The second situation in which polygraph evidence may be admitted is when used to impeach or corroborate the testimony of a witness at trial. Admission of polygraph evidence for these purposes is subject to three preliminary conditions. First, the party planning to use the evidence at trial must provide adequate notice to the opposing party that the expert testimony will be offered. Second, polygraph expert testimony by a party will be admissible only if the opposing party was given reasonable opportunity to have its own polygraph expert administer a test covering substantially the same questions. Failure to provide adequate notice or reasonable opportunity for the opposing side to administer its own test is proper grounds for exclusion of the evidence.

Finally, whether used to corroborate or impeach, the admissibility of the polygraph administrator's testimony will be governed by the Federal Rules of Evidence for the admissibility of corroboration or impeachment testimony. For example, Rule 608 limits the use of opinion or reputation evidence to establish the credibility of a witness in the following way: "[E]vidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." Thus, evidence that a witness passed a polygraph examination, used to corroborate that witness's in-court testimony, would not be admissible under Rule 608 unless or until the credibility of that witness were first attacked. Even where the above three conditions are met, admission of polygraph evidence for impeachment or corroboration purposes is left entirely to the discretion of the trial judge.

■ Neither of these two modifications to the per se exclusionary rule should be construed to preempt or limit in any way the trial court's discretion to exclude polygraph expert testimony on other grounds under the Federal Rules of Evidence. Our holding states merely that in the limited circumstances delineated above, the *Frye* general acceptance test does not act as a bar to admission of polygraph evidence as a matter of law. As we have stated, the chief criterion in determining whether expert testimony is appropriate is whether it will help the trier of fact to resolve the issues. Fed.R.Evid. 702; *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 685 (11th Cir. 1984). The expert testimony must also, of course, be relevant. Fed.R.Evid. 401; *United States v. Roark*, 753 F.2d 991, 994 (11th Cir.1985). Rule 401 defines relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, Rule 403 states that even though relevant, evidence may be excluded by the trial court "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Thus, we agree with the Ninth Circuit "that polygraph evidence should not be admitted, even for limited purposes, unless the trial court has determined that 'the probative value of the polygraph evidence outweighs the potential prejudice and time consumption involved in presenting such evidence.'" *United States v. Miller*, 874 F.2d 1255 (9th Cir. 1989) (*quoting Brown v. Darcy*, 783 F.2d 1389, 1397 n. 14 (9th Cir.1986)).

Thus under the Federal Rules of Evidence governing the admissibility of expert

testimony, the trial court may exclude polygraph expert testimony because 1) the polygraph examiner's qualifications are unacceptable; 2) the test procedure was unfairly prejudicial or the test was poorly administered; or 3) the questions were irrelevant or improper. The trial judge has wide discretion in this area, and rulings on admissibility will not be reversed unless a clear abuse of discretion is shown. *Worsham*, 734 F.2d at 686.

## V. Conclusion

We neither expect nor hope that today's holding will be the final word within our circuit on this increasingly important issue. The advent of new and developing technologies calls for flexibility within the legal system so that the ultimate ends of justice may be served. It is unwise to hold fast to a familiar rule when the basis for that rule ceases to be persuasive. We believe that the science of polygraphy has progressed to a level of acceptance sufficient to allow the use of polygraph evidence in limited circumstances where the danger of unfair prejudice is minimized. We proceed with caution in this area because the reliability of polygraph testing remains a subject of intense scholarly debate. As the field of polygraph testing continues to progress, it may become necessary to reexamine the rules regarding the admissibility of polygraph evidence.

The judgment of conviction is VACATED and the case is REMANDED to the district court for further proceedings consistent with this opinion.

JOHNSON, Circuit Judge, concurring in part and dissenting in part, in which RONEY, Chief Judge, HILL and CLARK, Circuit Judges, join:

I concur with the Court's holding that polygraph evidence should be admissible in this Circuit when both parties stipulate in advance to the circumstances of the test and to the scope of its admissibility, subject to the understanding that such stipulations may be accepted or rejected by the trial judge at his discretion.[1] I dissent, however, from the Court's finding that the polygraph has gained acceptance in the scientific community as a reliable instrument for detecting lies, and from the Court's holding that polygraph evidence is admissible under Fed.R.Evid. 608.

## I. POLYGRAPH THEORY

### A. *Introduction*

The Court's reasoning begins with the proposition that polygraph technology has reached the point where its accuracy is generally accepted by the scientific community. In fact, the scientific community remains sharply divided on the reliability of the polygraph. U.S. Congress, Office of Technology Assessment, *Scientific Validity of Polygraph Testing: A Research Review and Evaluation—A Technical Memorandum* 43 (1983) [hereinafter *OTA Memorandum*]. Many theorists question the basic assumptions underlying the polygraph: that telling lies is stressful, and that this stress manifests itself in physiological responses which can be recorded on a polygraph. *See* Ney, *Expressing Emotions and Controlling Feelings*, in *The Polygraph Test: Lies, Truth and Science* 65 (A. Gale ed.1988) [hereinafter *The Polygraph Test*]; *Employee Polygraph Protection Act: Hearing on H.R. 208 Before the Education and Labor Comm.*, 100th Cong., 1st Sess. 51 (1987) (testimony of John F. Beary, III, M.D. on behalf of the American Medical Association) [hereinafter *H.R. Hearing*]. Moreover, Congress has sharply limited use of the polygraph in the private sector. Employee Polygraph Protection Act of 1988, P.L. 100–347, 102 Stat.

---

**1.** If the parties wish to alter the applicability of Rules 403 and 702 in their case, they should be able to do so by advance stipulation, as long as they do not interfere with any third party's interests or the adjudicatory role of the courts. *See Wigmore on Evidence* § 7a (P. Tillers rev. 1983). *But see id.* at 602 n. 35 (courts generally hold polygraph results inadmissible even where there is a stipulation). Because such a stipulation would alter the applicability of rules of evidence, however, the trial judge has the discretion to reject the parties' proposed stipulation. The trial judge has broad discretion on questions of the admissibility of evidence and should not be reversed unless there is a clear abuse of discretion. *United States v. Borders*, 693 F.2d 1318, 1324 (11th Cir.1982); *Scheib v. Williams–McWilliams Co.*, 628 F.2d 509, 511 (5th Cir. 1980).

646 (codified at 29 U.S.C.A. § 2001 (West Supp.1989)).[2]

The polygraph device records the subject's physiological activities (e.g., heart rate, blood pressure, respiration, and perspiration) as he is questioned by a polygraph examiner. Bull, *What is the Lie Detection Test?* in *The Polygraph Test* 11–12. There are two major types of polygraph examinations: the "control question test" and the "concealed information test." The control question test is used most frequently in investigating specific incidents. The examiner compares the data corresponding to (a) questions relevant to the crime (b) "control" questions designed to upset the subject but not directly relevant to the crime, and (c) neutral questions. If the subject reacts more strongly to the relevant questions than to the control and neutral questions, then the examiner infers that the subject is lying. *Id.* at 13–17. There is much debate about the accuracy of control question tests in specific-incident investigations. Raskin, *Does Science Support Polygraph Testing*, in *The Polygraph Test* 98–99.

The concealed information test focuses on the fact that only the person involved in the crime could know the answers to certain questions. The examiner presents a series of multiple choice questions concerning the crime while the polygraph machine records the subject's physiological activities. If the subject has relatively strong physiological reactions to the correct alternatives, then the examiner infers that the subject is attempting to conceal information about the crime. *Id.* at 102. The concealed information test assumes that information about the crime is protected, but in fact police often inform all suspects and even the media about the crime. *Id.*

### B. The Polygraph Is Based On Questionable Assumptions

Lie detection is based on four assumptions: (1) that individuals cannot control their physiologies and behavior, (2) that specific emotions can be triggered by specific stimuli, (3) that there are specific relationships between the different aspects of behavior (such as what people say, how they behave, and how they respond physiologically), and (4) that there are no differences among people, so that most people will respond similarly.

The assumption that individuals cannot control their physiologies is subject to serious debate. Some theorists argue that individuals can learn to control their physiological responses and that by producing physiological responses at opportune times during the polygraph test these people could portray themselves as truthful when they are not. Ney, *Expressing Emotions and Controlling Feelings* at 67 ("Jet-fighter pilots learn to control their emotions (and therefore their physiology) in order to operate with maximum efficiency under extreme physical and psychological stress.") These techniques for fooling the polygraph are called countermeasures. Gudjonsson, *How to Defeat the Polygraph Tests* in *The Polygraph Test* 126. Little research has been done on the effectiveness of countermeasures in reducing detection of lies, but the results of research that has been done, while conflicting, indicate that countermeasures can be effective. *OTA Memorandum* at 100–01; Gudjonsson, *How to Defeat the Polygraph Tests* at 135 (concluding that use of physical countermeasures (e.g., pressing toes to floor) is effective when the subject has been trained in countermeasures).[3]

2. The Employee Polygraph Protection Act prohibits the use of polygraphs in pre-employment screening and sharply curtails the permissible uses of the polygraph in specific-incident investigations. 29 U.S.C.A. §§ 2002, 2006 to 2007 (West Supp.1989).

3. In order to fool the control question test, the subject must enhance his physiological reactions to neutral questions, and/or decrease his physiological reactions to relevant questions. Inducing physical pain or muscle tension during non-relevant questions can reduce the differ-

ence between physiological responses to relevant and neutral questions. One study found that pressing one's toes against the floor during neutral questions reduced the detection of lies from 75% to 10%. Gudjonsson, *How to Defeat the Polygraph tests*, at 129 (citing Kubis, *Studies in Lie Detection: Computer Feasibility Considerations* (Technical Report 62–205, prepared for Air Force Systems Command) (1962)). A competing study concluded that such countermeasures caused no reduction in detection of lies. *Id.* (citing More, *Polygraph Research and the University*, 14 Law and Order 73–78 (1966)).

Another assumption underlying the polygraph is that specific emotions will be triggered by the act of lying. Some theorists, however, do not believe that emotions are automatically triggered by the presence of such specific stimuli. These theorists see a more indirect causal chain between stimuli and emotion: a person is presented with stimuli, then appraises it, and only then reacts with an emotion, which is based on the person's cognitive appraisal of the stimuli.[4] According to this theory, people can adjust their thinking to "reappraise" the stressful stimuli and create a different emotional reaction than one might expect. Ney, *Expressing Emotions and Controlling Feelings* 68 ("tell the truth and think of something painful and the truth may appear on the polygraph as a lie").[5] Of course, there would be no way for an examiner to determine how the subject is appraising the stimuli in his mind.

The third assumption underlying the polygraph is that there are set patterns of physiological responses that reflect dishonesty: changed blood pressure, heart rate, respiration, and perspiration. There is controversy over this proposition in the scientific community. *Id.* at 70; *H.R. Hearing* at 51 (statement of John F. Beary, III, M.D.) ("there is no Pinocchio response. If you lie your nose does not grow a half inch longer or some other unique bodily response.")

The fourth assumption underlying the lie detector is that people can be expected to respond to similar stimuli in similar ways. Some researchers maintain, however, that individuals do not respond to stress similarly and that no one index can be used to measure emotions in different individuals. Ney, *Expressing Emotions and Controlling Feelings* at 71–72; Gudjonsson, *How to Defeat the Polygraph Tests* 135.

### C. Appellant's Statistics Are Misleading

Piccinonna claims that "the relevant scientific community"[6] estimates the accura-

---

The Office of Technology Assessment reviewed the available research on this issue in 1983 and concluded that counter-measures can be effective and that further research in the area is necessary to prevent persons engaged in illicit activities from creating "false negatives" on polygraph exams and, in this way, clearing themselves of any suspicion. *OTA Memorandum* at 100–01 ("The possible effects of counter-measures are particularly significant to the extent that the polygraph is used and relied on for national security purposes.... [T]hose individuals who the Federal Government would most want to detect (e.g., for national security violations) may well be the most motivated and perhaps the best trained to avoid detection.")

**4.** This is Lazarus's cognitive appraisal theory of emotion. *See* Ney, *Expressing Emotions and Controlling Feelings* at 68 (citing Lazarus, Coyne, and Folkman, *Cognition, Emotion and Motivation: The Doctoring of Humpty–Dumpty,* in *Approaches to Emotion* (K. Scherer and P. Ekman eds.1984)).

**5.** Even when the subject is not employing countermeasures, cognitive appraisal seems to affect the results of tests where the subject is accused of a nebulous crime or where the sole issue is criminal intent. In these cases, the issue is not as distinct as in cases where the subject is accused of a physical act. The issue calls for an interpretation, which may be subject to distortion or rationalization in the defendant's mind. Barland, *The Polygraph Test in the U.S.A. and Elsewhere* in *The Polygraph Test* 83–84. In the instant case, the defendant is accused of knowingly telling a falsehood when he denied knowl-

edge of an agreement among south Florida garbage companies. The defendant could have rationalized his answers to questions on such ambiguous issues, and avoided an emotional and a physiological response to the questions.

**6.** Piccinonna claims that the "relevant scientific community" is "those who have done research on the techniques and/or have had training or experience in the techniques [of polygraph testing]...." *Appellant's En Banc Brief* at 9. The Office of Technology Assessment has stated, however, that "Basic polygraph research should consider the latest research *from the fields of* psychology, physiology, psychiatry, neuroscience, and medicine" in order to develop a stronger theoretical base for the polygraph. *OTA Memorandum* at 6. It is reasonable to argue, therefore, that experts from these fields are competent to comment on the validity of polygraph testing. Gianelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later,* 80 Colum.L.Rev. 1197, 1210 (1980) ("'The purpose of the *Frye* test is defeated by an approach which allows a court to ignore the informed opinions of a substantial segment of the scientific community which stands in opposition to the process in question.'" (quoting *Reed v. State,* 283 Md. 374, 399, 391 A.2d 364, 377 (1978))). Congress has recognized that the community of experts competent to testify on the polygraph reaches beyond polygraph examiners and their proponents. For example, Dr. John F. Beary III appeared on behalf of the American Medical Association before the House Education and Labor Committee and the

cy of the polygraph to be in the upper-eighty to mid-ninety percent range. *Appellant's En Banc Brief* at 9. This figure is misleading and subject to serious dispute. The polygraph must do two things: correctly identify liars and correctly identify those who are telling the truth.[7] *Employee Polygraph Protection Act: Hearing on S. 185 Before the Senate Committee on Labor and Human Resources,* 100th Cong., 1st Sess. (Appendix to statement of John F. Beary, III, M.D.) (1988) [Hereinafter *"S. Hearing"*]. No single figure, therefore, can fully express the accuracy of the polygraph. The Office of Technology Assessment compiled the results of six prior reviews of polygraph research, ten field studies, and fourteen analog studies that the Office of Technology Assessment determined met minimum scientific standards. All of the studies used the control question technique in specific-incident criminal investigation settings. The results were as follows:

Six prior reviews of field studies:
-average accuracy ranged from 64 to 98 percent.

Ten individual field studies:
-correct guilty detections ranged from 70.6 to 98.6 percent and averaged 86.3 percent;
-correct innocent detections ranged from 12.5 to 94.1 percent and averaged 76 percent;
-false positive rate (innocent persons found deceptive) ranged from 0 to 75 percent and averaged 19.1 percent; and
-false negative rate (guilty persons found nondeceptive) ranged from 0 to 29.4 percent and averaged 10.2 percent.

Fourteen individual analog studies:
-correct guilty detections ranged from 35.4 to 100 percent and averaged 63.7 percent;
-correct innocent detections ranged from 32 to 91 percent and averaged 57.9 percent;

-false positives ranged from 2 to 50.7 percent and averaged 14.1 percent; and
-false negatives ranged from 0 to 28.7 percent and averaged 10.4 percent.

*OTA Memorandum* at 97. Note that because the question "Is the subject lying?" is a yes or no question, a random method of answering the question (e.g., a coin toss) would be correct 50% of the time. The Memorandum concluded,

The wide variability of results from both prior research reviews and [The Office of Technology Assessment's] own review of individual studies makes it impossible to determine a specific overall quantitative measure of polygraph validity. The preponderance of research evidence does indicate that, when the control question technique is used in specific-incident criminal investigation, the polygraph detects deception at a rate better than chance, but with error rates that could be considered significant.

*Id.*

D. *Extrinsic Factors Affect Accuracy*

A number of extrinsic factors affect polygraph validity. Most important, because the examiner must formulate the questions, supplement the data with his own impression of the subject during the exam, and infer lies from a combination of the data and his impressions, the level of skill and training of the examiner will affect the reliability of the results. S.Rep. No. 284, 100th Cong., 2d Sess. 42, *reprinted in* 1988 U.S.Code Cong. & Admin. News 726, 729 [hereinafter *Senate Report*]; Barland, *The Polygraph in the USA and Elsewhere* in *The Polygraph Test* 82. Unfortunately, there are no uniform standards for the training of polygraph examiners in this country. *Senate Report* at 43, U.S.Code Cong. & Admin. News at 731; *S. Hearing* at 27 (statement of Mr. William J. Scheve, Jr., American Polygraph Association); *see* Barland, *The*

---

Senate Committee on Labor and Human Resources to oppose the use of polygraphs in the workplace. *H.R. Hearing* at 51; *S. Hearing* at 16.

7. For example, a polygraph examiner who accused every subject of lying would be 100% accurate at detecting liars. His accuracy at detecting those who are truthful, however, would be unacceptably low.

*Polygraph in the USA and Elsewhere* at 75 (the American Polygraph Association has accredited over 30 polygraph schools with courses ranging from seven to fourteen weeks).

A quality control system that reviews the examiners' conclusions also affects the validity of polygraph results. The results of most federally administered polygraph exams are checked by quality control officers, who call for reexaminations if the data does not indicate that the examiner's conclusion was correct. Barland, *The Polygraph in the USA and Elsewhere* 87. Few police examiners work within such a system, and almost no private examiners have quality control. *Id.* at 82.

The length of a polygraph exam will also affect the validity of the results. One advocate of the polygraph has stated that an expert polygraph exam would take a minimum of several hours to complete. *Senate Report* at 43, 1988 *U.S.Code Cong. and Admin. News* at 730–31.

## II. POLYGRAPH TESTS SHOULD BE EXCLUDED UNDER THE FEDERAL RULES OF EVIDENCE

Under Federal Rule of Evidence 702, expert testimony is proper if the testimony would assist the trier of fact in analyzing the evidence. Fed.R.Evid. 702 advisory committee's note (West 1989). Because the polygraph can predict whether a person is lying with accuracy that is only slightly greater than chance, it will be of little help to the trier of fact. Moreover, this slight helpfulness must be weighed against the dangers of unfair prejudice, confusion of the issues and waste of time. Fed.R.Evid. 403. The Ninth Circuit has found that polygraph evidence has an overwhelming potential for prejudicing the jury. *Brown v. Darcy*, 783 F.2d 1389, 1396 (9th Cir.1986) (citing *United States v. Alexander*, 526 F.2d 161, 168 (8th Cir.1975)); *see also* Gianelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half–Century Later*, 80 Colum.L.Rev. 1197, 1237 (1980) ("The major danger of scientific evidence is its potential to mislead the jury; an aura of scientific infallibility may shroud the evidence and thus lead the jury to accept it without critical scrutiny.") The

*Brown* court determined that unstipulated polygraph evidence is inadmissible under both Rule 702 and Rule 403. *Brown*, 783 F.2d at 1396 n. 13. The polygraph presents itself as being very scientific. For instance, it is said to measure "galvanic skin response," *Appellant's En Banc Brief* at 10, which merely means that it measures how much a person perspires. Bull, *What is the Lie–Detection Test?* at 11. This scientific aura tends to cloud the fact that the machine's accuracy at detecting lies is little better than chance. *Brown*, 783 F.2d at 1396 (quoting *Alexander*, 526 F.2d at 168); *OTA Memorandum* at 97.

The Ninth Circuit also found that admission of polygraph evidence had the potential of confusing the issues and wasting time. *Id.* at 1397; *see* Fed.R.Evid. 403. In the *Brown* case, for instance, the polygraph evidence consumed one fourth of the entire trial. *Brown*, 783 F.2d at 1397 (two full days of an eight-day trial). Because polygraph evidence is of little help to the trier of fact, and has great potential for prejudicing the trier of fact, confusing the issues and wasting time, it should be excluded under Federal Rule of Evidence 403.

The danger of prejudice, confusion of the issues and wasting time should also prevent courts from admitting polygraph evidence under Rule 608 for purposes of impeaching a witness. As the Court's opinion correctly states, all offers of polygraph evidence should be analyzed in light of Rule 403. *Cf. United States v. Miller*, 874 F.2d 1255, 1261 (9th Cir.1989) (even when offered for a limited purpose, polygraph evidence must go through a Rule 403 analysis). To hold that polygraph evidence is admissible under Rule 608 would create too large an exception to the rule barring polygraph evidence generally, and polygraph test results would wind up being admitted into evidence in most cases. Moreover, there is nothing special about the Rule 608 impeachment procedure that lessens the dangers of prejudice and confusion of the issues. *Cf. United States v. Toney*, 615 F.2d 277 (5th Cir.1980) ("Rule 403 is a general rule, 'designed as a guide for the handling of situations for which no specific rules have been formulated.' ")

**1542**

### III. CONCLUSION

The scientific community remains sharply divided over the issue of the validity of polygraph exams. Although presented as a rigorously "scientific" procedure, the polygraph test in fact relies upon a highly subjective, inexact correlation of physiological factors having only a debatable relationship to dishonesty as such. The device detects lies at a rate only somewhat better than chance. Polygraph evidence, therefore, should not be admissible under Rule 702 or under Rule 608 to impeach a witness.

In this case, the government did not stipulate to the admissibility of the defendant's polygraph evidence and did not participate in selection of the examiner or the determination of the circumstances of the test. I would therefore AFFIRM the judgment below.