Joseph **TOUSSAINT**, et al.,
Plaintiffs–Appellees,

v.

Daniel **McCARTHY**, et al.,
Defendants–Appellants.

Joseph **TOUSSAINT**, et al.,
Plaintiffs–Appellees,

v.

James **ROWLAND**, Director, California Department of Corrections; Daniel Vasquez; Robert Borg, Defendants–Appellants.

Nos. 87–2910, 89–15613.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 16, 1990.

Decided Oct. 30, 1990.

As Amended Jan. 2, 1991.

---

Sanford Jay Rosen, Andrea G. Asaro and Samuel R. Miller, Rosen & Associates, San Francisco, Cal., for plaintiffs-appellees.

Before CHAMBERS, WIGGINS and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

These consolidated appeals involve a class of prisoners, who, as a class, are the toughest for a prison to handle. They are at the bottom of the social heap. They have, nonetheless, a human dignity and certain rights secured by the Constitution of the United States. The command of the Constitution has to be made concrete. At the same time prisons must be run by prison officials not judges. The tension between proper administrative discretion and necessary constitutional concreteness has produced this appeal, the fifth in this case.

The basic case was begun 17 years ago, in 1973 as a class action under 42 U.S.C. § 1983 by inmates of four maximum security prisons administered by the State of California. The defendants were the administrators. The relevant principles and law of the case have been established in prior decisions, most notably and relevantly in *Toussaint IV, Toussaint v. McCarthy,* 801 F.2d 1080 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). It is not our Sisyphean task to revisit those decisions or revise their holdings. We apply them, determining here only those issues where their application has been challenged.

The appeal presents five issues where the administrator of San Quentin challenges the district court's modification of its permanent injunction:

1. *The Monitor.* The modified injunction appoints a monitor "to entertain requests on behalf of individual prisoners for review of decisions to assign the prisoners to segregation for 'administrative' reasons." The district court under *Toussaint IV* at 1114 had authority to appoint such a monitor if the district court determined that these conditions existed: (1) the administrators' procedures for segregation did not comply with due process; (2) the administrators were "unlikely to comply voluntarily"; and (3) a monitor was necessary to obtain compliance.

Bruce M. Slavin, Peter J. Siggins and George D. Prince, Deputy Attys. Gen., San Francisco, Cal., for defendants-appellants.

■ These conditions have not been met. The record shows that the defendants "have not wilfully violated the due process rights of any prisoner. In fact, [the officials] operate an elaborate system of procedures with every hope that it will prevent due process violations." [ER 2935 at p. 48] A monitor who was already in place invited the segregated prisoners, then numbering 780, to complain if they had been improperly segregated. On the basis of the complaints that followed this invitation, the monitor found five prisoners the basis of whose segregation was not supported by evidence. A rate of unintentional constitutional error of 5/780 does not show an inability to comply with constitutional norms. See McCrae v. Hankins, 720 F.2d 863, 868 (5th Cir.1983); Ruiz v. Estelle, 679 F.2d 1115, 1132 (5th Cir.), vacated and amended in part on other grounds, 688 F.2d 266 (5th Cir.1982), cert. denied, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). The federal district court as an institution, or the court of appeals for this circuit, is not error-free and scarcely has a better record of non-intentionally depriving persons of rights secured by the Constitution.

The continued appointment of the monitor was not justified under Toussaint IV. The initial appointment was for one year from the date of the court's order, April 21, 1989. The initial appointment expired. On April 30, 1990 the district court ordered the monitor to continue his duties until further notice. We hold that there is no justification for continuation of the appointment. In order to allow the monitor to windup his business in an orderly fashion, we hold that his appointment will cease 60 days from the date of the issuance of the mandate.

■ 2. Polygraph Examinations. The district court prohibited the use of polygraph examinations by prison officials in determining whether a prisoner had really given up his gang association. The officials used them in conjunction with other evidence and did not rely on them as absolute predictors of behavior. The district court forbade them because the officials did not offer proof that the tests were reliable.

"Lie detectors," as they were once popularly called, are not infallible instruments for measuring veracity. The results of a polygraph examination can constitute corroboratory evidence. Zimmerlee v. Keeney, 831 F.2d 183, 187 (9th Cir.1987), cert. denied, 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988). As used at San Quentin, the results of such examinations do constitute sufficient evidence to meet the standard laid down by Superintendent v. Hill, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), and by Toussaint IV, 801 F.2d at 1105.

Under Hill what is required in a prison disciplinary hearing is "some evidence from which the conclusion of the administrative tribunal could be deduced." Hill, 472 U.S. at 455–456, 105 S.Ct. at 2774. What is "some evidence" in this context is pointedly distinguished by the Supreme Court from the kind of evidence that would be required by due process "in less exigent circumstances." Id. The kind of evidence found constitutionally sufficient in Hill would not have passed muster to send a man to prison. Interpreting Hill, Toussaint IV at 1105 noted that "the administrator's experience and awareness of general prison conditions" had to be taken into account in determining whether or not the administrator was acting on evidence. Judged by this generous standard, polygraph examinations which are used as a helpful tool in decisions about gang membership, but which are not treated as unfailingly accurate, violate no due process right of prisoners.

There "must be some indicia of reliability of the information that forms the basis for prison disciplinary actions." Cato v. Rushen, 824 F.2d 703, 705 (9th Cir.1987). Uncorroborated hearsay by a confidential informant is not reliable information. Id. Nor is such reliability increased by a polygraph examination that is admittedly "inconclusive." Id. But a careful review of polygraph evidence by the Eleventh Circuit notes that "in recent years polygraph testing has gained increasingly widespread acceptance as a useful and reliable scientific tool." United States v. Piccinonna, 885 F.2d 1529, 1535 (11th Cir.1989) (en banc). Accordingly, that circuit permits polygraph evidence to be used by stipulation or to corroborate or impeach a witness. Id. at 1536. It would be strange that tests which could be used to impeach or corroborate did not constitute "some evidence." Polygraphs are not infallible. But "a great deal of lay testimony routinely admitted is at least as unreliable and inaccurate, and other forms of scientific evidence involve risks of instrumental or judgmental error." Id. at 1533 (quoting McCormick on Evidence § 206 at 629 (1984)). In the special context of prison discipline use of the polygraph test does not violate due process.

■ 3. *The Decision to Segregate.* San Quentin gives an inmate the reasons in writing why he is to be segregated and the inmate has the opportunity to speak at a hearing before the Institutional Classification Committee. The committee is the warden's designated decision-maker as to segregation. But, so the district court found, the actual decision to segregate is made by the Criminal Activities Coordinator, an official who is in contact with counterparts at other prisons as to gang activities.

Due process requires that a prisoner have "an opportunity to present his views" to the official "charged with deciding whether to transfer him to administrative segregation." *Hewitt v. Helms,* 459 U.S. 460, 476, 103 S.Ct. 864, 874, 74 L.Ed.2d 675 (1983). At San Quentin a committee hears, but the coordinator decides. The district court was right in correcting this gap by ordering that the coordinator hear.

■ 4. *Periodic Review.* San Quentin reviewed the decision to segregate every 120 days; the monitor agreed; the district court said it should be every 90 days. The authority for the action of the district court is the Constitution. The Constitution does not support a nice distinction between 90 days and 120 days. The question is one of discretion. Is it to be the discretion of the prison administrators or the discretion of a district court? Nothing in the Constitution invests the district court with discretion to override the discretion of the prison officials on this administrative point. Here administrative discretion must prevail; 120 days satisfies due process.

5. *Access to the Courts. Toussaint IV* accorded the district court authority to fashion a plan for "meaningful access" to the courts if the parties failed to agree on a plan. 801 F.2d at 1110. An understandably acute tension exists between the administrators' concern for safety and the prisoners' interest in getting books that will help them with a case attacking their conviction or complaining of their treatment. The administrators, on August 26, 1987 after the monitor's report and before the district court's order, opened a separate library for segregated inmates. All segregated inmates who want to use it may use it. This library rendered moot the question of what should be done if a segregated prisoner was not permitted to visit a law library. *See O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974). No need to beat a dead horse. *Lindquist v. Idaho State Board of Corrections,* 776 F.2d 851, 854 (9th Cir. 1985).

A collection of books is never a substitute for a lawyer. We should not romanticize what even a jailhouse lawyer, much less a poorly-educated inmate, can accomplish by rummaging for a few hours in a limited collection. Many intelligent prisoners can pick up the lingo of the law; very few of them can put it all together and present a persuasive petition or claim. Many judges describe what the courts do with prisoners' suits as "providing therapy." It is doubtful that the Constitution assures prisoners this kind of nonmedical therapy. But as long as one prisoner is unjustly detained or one prisoner maltreated a lifeline to the courts is precious. In the context of this case the segregated prisoners' library is part of the lifeline.

As the question is moot, there is no need or even jurisdiction to say more. But one aspect of the question might be considered still alive: the scope of the segregated prisoners' library. The district court understood "access to the courts" to mean access as to every kind of legal claim at every stage of its litigation and modified its injunction to provide such access. It might be thought that this part of its order applied to the new library.

■ Access to the courts as determined by the Supreme Court means access to bring a petition for habeas corpus or to initiate a civil rights action. *See Bounds v. Smith,* 430 U.S. 817, 827–28, 97 S.Ct. 1491, 1497–98, 52 L.Ed.2d 72 (1977). Opportunity "to file a petition and complaint in court" satisfies due process. *Carter v. Fair,* 786 F.2d 433 (1st Cir.1986). We have enlarged the right to include access to fight extradition. *Eldridge v. Block,* 832 F.2d 1132, 1138 (9th Cir.1987), and the right includes access to the library to prepare "appeals and other legal documents." *Lindquist v. Idaho State Board of Corrections,* at 856. We now make clear that the reference to "appeals and other legal documents" refers to appeals in habeas corpus and civil rights actions and "other legal documents" refers to such documents as a court may find it appropriate for an inmate to file. Once an inmate is before the court, the court can determine if further legal assistance is needed. *Bee v. Utah State Prison,* 823 F.2d 397, 399 (10th Cir.1987); *Nordgren v. Milliken,* 762 F.2d 851 (10th Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985). The scope of

the new library need not be greater than the scope of the constitutional concept of access to the courts.

*Conclusion.* In the light of the foregoing, the order of the district court continuing the monitor, prohibiting polygraph examinations, and requiring a review of segregation decisions every 90 days is reversed; the authority of the monitor shall expire 60 days after the date the mandate is issued; the part of the order providing for legal assistance for segregated prisoners is vacated as moot; the part of the order requiring the prisoner be heard by the Criminal Activities Coordinator is affirmed.

WIGGINS, Circuit Judge, concurring and dissenting:

In 1973 inmates of four maximum security California state prisons brought this class action against officers of those prisons. The inmates' complaints relevant to this appeal concerned San Quentin prison officials' procedures for segregating allegedly gang-affiliated inmates and San Quentin's and Folsom's procedures for providing segregated inmates with access to the courts. Prison officials appeal the district court's modification of its permanent injunction on these issues. I would affirm the judgment below. Accordingly, I dissent.

Our standard of review is important to an understanding of my views. The district court's findings of fact are to be upheld unless clearly erroneous. *Toussaint v. McCarthy,* 801 F.2d 1080, 1087 (9th Cir. 1986) [*Toussaint IV*], *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). We review de novo the district court's legal conclusions. *Id.* We review the scope of the district court's order of injunctive relief for abuse of discretion, "scrutiniz[ing] the injunction closely to make sure that the remedy protects the plaintiffs' constitutional rights and does not require more of state officials than is necessary to assure their compliance with the constitution." *Id.* at 1089.

## A. SEGREGATION PROCEDURES

California segregates gang-affiliated inmates from the general prison population. In *Toussaint IV* we determined that under California law freedom from this type of segregation constitutes a liberty interest such that due process requires that an inmate segregated for gang affiliation must be given an informal adversary hearing within a reasonable time, telling him the reason for his segregation and allowing him to present his views. *Id.* at 1100. We remanded to the district court to determine whether San Quentin's procedures met these requirements. *Id.* at 1114.

On remand, the district court found, with the assistance of a monitor, that the prison's procedures for segregating gang-affiliated inmates require that within thirty days after segregating an inmate based upon his alleged gang affiliation, prison officials must give the inmate written reasons for his segregation and an opportunity to speak at a hearing before the Institutional Classification Committee—the warden's designated decision-maker in segregation matters. The district court also found, however, that the prison's Criminal Activities Coordinator—the correctional officer designated to collect and exchange with his counterparts at other prisons information concerning prison gang activities—makes the critical determination of whether an inmate is a gang member.

The district court found further that if the Classification Committee approves an inmate's segregation on the basis of gang affiliation, the Committee must consider the inmate for release at least every 180 days thereafter. The district court noted that the Classification Committee has in some cases failed to meet the 180–day review requirement. The district court also found that the Classification Committee will not release an inmate from segregation unless he passes a polygraph exam in which he states that he is no longer gang-affiliated.

To determine whether prison officials had improperly segregated inmates under its then existing procedures, the monitor sent a notice to all 780 inmates segregated

at San Quentin at the time "to hear from the prisoners who think they are in segregation without any good reason at all." From this survey, the monitor found five cases in which he could not discern any basis for the inmates' placement or retention in segregation from the record or from prison officials' memories. Although segregated inmates may administratively appeal their segregation decisions, the district court found a lack of evidence concerning whether this process corrects erroneous segregation decisions.

### 1. Review by the Criminal Activities Coordinator

The district court found that the Criminal Activities Coordinator effectively determines gang affiliation. The court held, therefore, that due process requires prison officials to allow an inmate segregated on the basis of gang affiliation a hearing before the Criminal Activities Coordinator as well as before the Classification Committee. I agree with the decision on this issue by the majority.

### 2. Polygraph Exams

The district court found no evidence that the polygraph exams that prison officials use in determining whether inmates have ceased their gang affiliation are reliable. The court, thus, held that prison officials' use of polygraph evidence in making segregation decisions violates due process.

Prison officials claim that the district court should have deferred to their allegedly reasonable judgment that polygraph exams are useful in assessing witness credibility. They argue that although polygraph exams are not permitted in trials, polygraph exams should be permitted in their informal, non-adversarial reviews of inmates' gang affiliations. They note that the monitor found that polygraph exams may be used to determine the credibility of inmate informants.

Indeed, the district court did not find that the use of polygraph exams had led prison officials to retain any inmates in segregation improperly. And whenever this court has discussed polygraphs, it has not intimated that their use could violate due process. See United States v. Miller, 874 F.2d 1255, 1263 (9th Cir.1989) (characterizing erroneous introduction of polygraph evidence as a nonconstitutional error); Zimmerlee v. Keeney, 831 F.2d 183, 187 (9th Cir.1987), cert. denied, 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988).

However, the district court correctly noted that the monitor gave prison officials the opportunity to present evidence that their polygraph exams are reliable, but the officials failed to do so. Given that polygraph exams are generally deemed unreliable as evidence, see People v. Miller, 208 Cal.App.3d 1311, 1314, 256 Cal.Rptr. 587 (1989) (collecting cases), and that a constitutionally protected liberty interest is at issue, the district court properly placed on prison officials the burden of producing evidence to the contrary—especially evidence that prison officials conduct their polygraph exams in a reliable manner, see Brown v. Darcy, 783 F.2d 1389, 1391 (9th Cir.1986) (polygraph exams are of dubious accuracy and even when parties agree to their admissibility it must be shown that the tests were administered reliably); United States v. Piccinonna, 885 F.2d 1529, 1540 (11th Cir.1989) (en banc) (Johnson, J., concurring in part and dissenting in part) (the examiner's skill and training affects the reliability of the exam). The burden to prison officials to produce some evidence of the reliability of a polygraph examination is not excessive. Nevertheless prison officials failed to carry this burden. Under these circumstances, it is my view that the district court did not abuse its discretion in prohibiting prison officials from considering a prisoner's failure to pass a polygraph exam in making segregation decisions based on gang affiliation.

In our previous consideration of this case, we held that "the exigencies of prison administration allow prison administrators to make segregation decisions on the basis of 'some evidence,' including the administrator's experience and awareness of general prison conditions...." Toussaint IV, 801 F.2d at 1105. However, such evidence

must meet minimal standards of reliability. *See Cato v. Rushen,* 824 F.2d 703, 705 (9th Cir.1987). To allow the admission of asserted information not demonstrated to meet minimal standards of reliability to meet the "some evidence" requirement would subvert the requirement's rationale—assuring that prison officials act fairly rather than arbitrarily.

### 3. *Ninety–Day Periodic Review*

The district court required that prison officials review the cases of inmates segregated on the basis of gang affiliation every ninety days. Prison officials claim that only a 120–day periodic review is necessary.

Prison officials correctly note that the inmates point to no evidence in the *remand* record that gang membership changes often enough to require a ninety-day review. On remand, the inmates pointed only to evidence that relationships between gangs are in constant flux, not to evidence that individual gang affiliation is in such flux. But *at trial,* the district court found that "alliances and enmities among inmates shift constantly." *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1405 (N.D.Cal.1984) [*Toussaint III*]. On review, this court did not find that determination to be clearly erroneous. Given this factual finding, the district court did not abuse its discretion in requiring review of an inmate's gang affiliation status every ninety days. As the Eighth Circuit has stated, although the frequency of review should usually be left to the informed discretion of prison officials, "ninety days is a lengthy time between reviews and ... approaches constitutional limits." *Tyler v. Black,* 811 F.2d 424, 429 (8th Cir.1987) (not requiring review more frequently than every ninety days only because inmates were also "evaluated at least once a week by case workers"), *vacated in part on other grounds and adopted in part,* 865 F.2d 181 (8th Cir.) (en banc), *cert. denied,* 490 U.S. 1027, 109 S.Ct. 1760, 104 L.Ed.2d 196 (1989).

### 4. *The Monitor and Individual Case Review*

The district court provided in its injunction that, for at least a year, it—through a monitor—will review prison officials' decision to segregate an inmate on the basis of gang affiliation if the inmate so requests. Prison officials contest the propriety of both the district court's appointment of the monitor and the district court's provision for individual case review.

I start from the proposition that the federal courts should not supervise the administration of state prisons. Courts are ill-equipped to manage prisons and our federal system places on the states the responsibility as well as the authority to run their own prison systems. *Toussaint IV,* 801 F.2d at 1086. However, in the face of prison officials' violations of inmates' constitutional rights, a federal court must act. *Id.* The federal court must fashion the least intrusive remedy that will both effectively cure the constitutional violations and prevent their repetition. *Id.* at 1086–87. In *Toussaint IV,* we therefore directed the district court to order further relief, such as the appointment of a monitor, only if it found that prison officials would be unwilling to comply with its injunction voluntarily and that the ordered relief would be necessary to ensure compliance. *Id.* at 1114.

I believe that the district court did not abuse its discretion in appointing a monitor. On remand, the district court did not expressly find that prison officials would be unwilling to comply with the requirements of the constitution. But the district court did adopt the monitor's conclusion that prison officials had failed to comply with its prior injunctive orders. Indeed, the almost two decade history of this case is itself a testament to prison officials' recalcitrance in curing constitutional violations. Although prison officials' failure to comply with the district court's prior orders cannot be used as a basis for now imposing on prison officials requirements stricter than the constitution requires, *see id.* at 1105, such failure to comply is evidence that prison officials lack either the desire or the ability to comply in the future, and is thus "a relevant factor in determining the necessary scope of an effective remedy,"

*id.* at 1087. As the Seventh Circuit has noted, the appointment of a monitor is peculiarly appropriate when there has been recalcitrance on the part of prison officials:

> [T]he appointment of a special master was particularly desirable for the final injunctive order in this case, where noncompliance with the previous district court orders was emphasized. The record here is replete with instances of administrative recalcitrance. Therefore appointing a special master directed to supervise and coordinate the actions of prison officials to effectuate full compliance is especially appropriate for cases such as this challenging conditions of prison confinement.

*Williams v. Lane,* 851 F.2d 867, 884 (7th Cir.1988) (citation deleted), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). Under these circumstances I believe the district court did not abuse its discretion in appointing a monitor.

Similarly I believe that the district court did not abuse its discretion in finding that state habeas actions and suits for contempt were inadequate procedures for ensuring that prison officials comply with the constitution in segregating inmates, and in providing for more swift individual case review. Even without conducting an exhaustive search, the district court found five instances in which prison officials placed or retained inmates in segregation in violation of their due process rights. Prison officials downplay this finding. They characterize their past segregation decisions as involving only a one percent error rate and note that due process does not require error-free decision making, *see McCrae v. Hankins,* 720 F.2d 863, 868 (5th Cir.1983). But the monitor did not merely find five cases of erroneous segregation decisions. Indeed, the monitor did not even attempt to determine how many inmates had been incorrectly segregated. Given the federal courts' highly deferential standard for reviewing state prison segregation decisions, such an inquiry by the monitor would have been improper. *See Toussaint IV,* 801 F.2d at 1105. Rather, the monitor found five cases in which prison officials violated inmates' due process rights by placing or

retaining them in segregation without any evidence in the record supporting their segregation decisions.

Furthermore, at the time when they made the segregation decisions in question, prison officials must have been aware that they made these decisions in violation of the inmates' constitutional rights. The Supreme Court articulated the requirement that segregation decisions be based upon some evidence in the record in June 1985. *See Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). Yet the three instances in which prison officials made segregation decisions without some evidence in the record that the monitor specifically recounts occurred in 1987. And although the monitor does not state when the other two instances occurred, the record indicates that at least one occurred after the *Hill* decision as well.

Under these circumstances, I believe the district court did not abuse its discretion in providing for individual case review.

## B. ACCESS TO THE COURTS

In *Toussaint IV,* we held constitutionally inadequate prison officials' then-current programs for providing segregated inmates with access to the courts, 801 F.2d at 1114, and reiterated the Supreme Court's directive that meaningful access to the courts requires that prison officials provide legal counsel to inmates denied access to a prison law library, *id.* We remanded to the district court to determine how best to provide prisoners meaningful access to the courts in light of prison officials' interest in institutional security and economy. *Id.*

### 1. *Legal Assistance to Segregated Inmates*

Consistent without decision in *Toussaint IV,* the district court formulated a plan detailing how prison officials should provide legal assistance to an inmate to whom they deny access to a law library and who cannot obtain private or appointed counsel. Prison officials argue, however, that the district court abused its discretion by requiring them to provide all segregated in-

mates with *both* library access and legal assistance. Prison officials mischaracterize the injunction. The district court provided that:

> [For] any prisoner assigned to segregation whom defendants determine, or are deemed to have determined, will not be permitted to visit and use a law library, who is not able to afford retained private counsel, and who cannot otherwise secure appointed counsel, defendants shall provide upon request with adequate assistance by persons trained in the law.

Prison officials retain their discretion to decide, in the first instance, whether to allow a particular segregated inmate access to the law library. If, however, in the exercise of their discretion prison officials deny an inmate library access, then the injunction requires them to provide that inmate with legal assistance.[1]

Prison officials also contend that the district court abused its discretion by specifying a remedy for their failure to provide segregated inmates with constitutionally adequate access to the courts, rather than simply holding the present procedures inadequate and directing prison officials to adopt new ones. There is no abuse of discretion where the district court orders the defendants to do what the constitution requires of them. The district court exercised no discretion in concluding, as a matter of law, that the constitution required them to provide legal assistance to inmates denied library access. *See Bounds,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977) (fundamental constitutional right of access to the courts requires prison authorities to provide prisoners with adequate law libraries or with adequate assistance from persons trained in the law); *Lindquist v. Idaho State Bd. of Corrections,* 776 F.2d 851, 855 (9th Cir.1985) (pris-

on must provide an adequate law library or, in the alternative, adequate assistance from persons trained in the law). Indeed, prison officials concede that the constitution requires them to provide either access to a law library or legal assistance.

To the extent that the district court did exercise discretion in formulating the procedures for prison officials to use in implementing the constitutional requirements, I believe the district court properly did so in accordance with our instruction that "[i]f the parties fail to agree on a plan that provides meaningful access to the courts, the district court shall fashion one." *Toussaint,* 801 F.2d at 1110. Earlier in this litigation the district court did simply provide that "[p]risoners shall be given reasonable opportunity to study law books," without providing a detailed plan to implement this directive. *See Toussaint v. Rushen,* 553 F.Supp. 1365, 1385 (N.D.Cal.1983), [*Toussaint I*], *aff'd in part, Toussaint v. Yockey,* 722 F.2d 1490 (9th Cir.1984) [*Toussaint II*]. It was only upon the monitor's subsequent findings that prison officials delayed an average of two weeks in providing inmates with access to law libraries and permitted only inmates with court deadlines such access, that the district court found it necessary, in accordance with our previous decision, to order more detailed relief.

Prison officials attempt to escape this conclusion by arguing that the constitution also permits them to provide meaningful access to the courts with a "hybrid" procedure whereby inmates receive limited library access and limited legal assistance. They rely upon the statement in *Cepulonis v. Fair,* 732 F.2d 1, 6 (1st Cir.1984), that when prison officials violate prisoners' right of meaningful access to the court by providing them with insufficient library access time, a court may order limited legal

---

**1.** Prison officials argue that the district court's provision that they provide legal assistance to segregated inmates "whom defendants ... *are deemed to have determined* will not be permitted to visit and use a law library," divests them of their discretion to decide initially whether to allow particular inmates library access or to provide them with legal assistance. The "deemed to have determined" provision might in the abstract seem to imply that inmates who

have not actually been denied access to a law library can be "deemed" to have been denied access. Yet, the modified injunction clearly states that an inmate will be deemed to have been denied access to a law library only if prison officials have "fail[ed] ... to permit [him] to visit and use a law library for a period of at least two (2) hours within seven (7) calendar days after [his] request to visit and use the law library."

assistance to supplement this otherwise insufficient library access time. Of course, whether prison officials' hypothetical hybrid procedure, if implemented, would be constitutionally sufficient, is not an issue now before us. However, *Cepulonis* did not require that a court, faced with a violation of prisoners' right of meaningful access to the courts, defer to prison officials' determination of how to remedy that violation. To the contrary, *Cepulonis* explicitly held that a court should order specific procedures to remedy a violation of prisoners' right of meaningful access to the courts. The district court's order here is consistent with *Cepulonis*.

Nor in my view does prison officials' apparent opening of a separate law library for segregated inmates at San Quentin since the monitor's report to the district court render the district court's order "unnecessary" or "premature," as prison officials contend. This litigation has been ongoing since 1973. In 1987 prison officials had still failed to provide inmates with constitutionally adequate access to the courts. Under these circumstances, the district court need not have waited to order relief until the separate library was operational and its sufficiency—as well as the sufficiency of prison officials' program for providing segregated inmates access to it— could be evaluated under constitutional standards. Nor would the issue of the adequacy of prison officials' provision to inmates of access to the courts have been moot even if the prison officials' newly instituted program had been found to be sufficient. *See Lindquist,* 776 F.2d at 854 (voluntary cessation of illegal conduct does not moot a case unless "(1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.") (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)).

2. *The Scope of Legal Assistance to Segregated Inmates*

Prison officials next contend that, even if they must provide legal assistance to inmates to whom they deny law library access, the district court abused its discretion in requiring that they provide legal assistance "in all areas of civil and criminal law, including family law ... until ... all relief desired by the prisoner is secured;" or until a court terminates the inmate's proceeding by entering a final, non-appealable order; or the provider of legal assistance concludes that the prisoner's desired position is without merit; or that pursuing the claim further would be inequitable.

Prison officials first claim that a segregated inmate has a right to legal assistance only for challenges to the conviction for which he is incarcerated or to the conditions of his incarceration. This is an issue of first impression for this court. The rationales of previous Supreme Court and sister circuit cases, however, indicate that if prison officials deny an inmate access to a law library, then they must provide him with legal assistance for all claims that he has.

The necessity for inmate legal assistance stems from an inmate's constitutional right of access to the courts. *See Bounds,* 430 U.S. at 821–25, 97 S.Ct. at 1494–96. A citizen's general constitutional right of access to the courts encompasses access for all civil and criminal matters. *See Jackson v. Procunier,* 789 F.2d 307, 311 (5th Cir. 1986); *Nordgren v. Milliken,* 762 F.2d 851, 853 (10th Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985). There is nothing in the custodial setting of a prison that warrants interpreting an inmate's right of access any more narrowly. *See, e.g., Straub v. Monge,* 815 F.2d 1467, 1470 (11th Cir.) (the right to meaningful access to the courts applies to a civil forfeiture action against an inmate), *cert. denied,* 484 U.S. 946, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987); *Jackson,* 789 F.2d at 311 (the right to meaningful access applies to an inmate's civil suit); *Corpus v. Estelle,* 551 F.2d 68, 70 (5th Cir.1977) (the right of meaningful access to the courts includes but is not limited to general civil matters like divorce and small civil claims).

Therefore, the *Bounds* reasoning requires that prison officials provide legal assistance for all civil and criminal claims of an inmate denied access to a law library. Moreover, because an inmate could theoretically use a prison law library to research claims beyond those concerning his conviction or the conditions of his incarceration,[2] legal assistance which is meant to replace that access should extend to those other claims.[3] Therefore, the district court properly required that legal assistance extend to all claims of an inmate denied access to a law library. I believe the majority errs in confining a prisoner's access to courts only to library materials necessary to bringing a petition for habeas corpus or to initiating a civil rights action.

Prison officials also claim an inmate's right to legal assistance in the absence of access to a law library should not extend beyond the initial pleading or answer stage of a proceeding. This, too, is an issue of first impression before this court.

Prison officials cite language from a footnote in *Bounds* that its "main concern ... 'is protecting the ability of an inmate to prepare a petition or complaint.'" *Bounds*, 430 U.S. at 828 n. 17, 97 S.Ct. at 1498 n. 17 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974)). But, nothing in *Bounds* indicates that the court thought the constitution only extended to that first stage of pleading. In fact, the *Bounds* reasoning is equally compelling at any stage of a proceeding:

> [I]f the State files a response to a pro se pleading, it will undoubtedly contain seemingly authoritative citations. *Without a library, an inmate will be unable to rebut the State's argument.* It is not enough to answer that the court will evaluate the facts pleaded in the light of the relevant law. Even the most dedicated trial judges are bound to overlook meritorious cases without the benefit of an adversary presentation.

*Bounds*, 430 U.S. at 826, 97 S.Ct. at 1497 (emphasis added).

One other circuit has held that inmates denied access to a law library need not be provided legal assistance beyond the pleading stage of legal proceedings, apparently due to concerns about cost. *Nordgren*, 762 F.2d at 855 (upholding injunctive relief which provided legal assistance to inmates only for the pleading stage). However, cost may not be determinative, *see Bounds*, 430 U.S. at 825, 97 S.Ct. at 1496 (economic factors may be considered but the cost of protecting a constitutional right may not justify its total denial), especially when—as here—the added cost results from prison officials' decision not to provide inmates with library access. I believe that without legal assistance or library access at all stages of a proceeding, an inmate's right of access to the courts is not effective or meaningful. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1212 (11th Cir.1981); *see generally Morrow v. Harwell*, 768 F.2d 619, 623 (5th Cir.1985) ("*Bounds* explained that for access to be meaningful, post-filing needs, such as the research tools necessary to effectively rebut authorities cited by an adversary in responsive pleadings should be met.").

As is apparent from the foregoing, the issues presented in this appeal focus almost exclusively on decisions that are com-

---

**2.** Constitutionally adequate law libraries contain general legal reference material. *See Bounds*, 430 U.S. at 819 n. 4, 97 S.Ct. at 1493 n. 4 (library containing state codes, state and federal case reporters, federal codes, treatises or hornbooks, is constitutionally sufficient). Furthermore, prison law libraries can obtain materials from other libraries that an inmate requests. *See, e.g., McElyea v. Babbitt*, 833 F.2d 196, 199 (9th Cir.1987).

**3.** Prison officials' complaint that inmates will use legal assistance to pursue frivolous cases lacks merit. The district court's injunction spe-

cifically provides that the provider of legal assistance can terminate assistance if he determines that the inmate's position has no merit or that further prosecution of the inmate's claim would be inequitable. Furthermore, prison officials' assumption that providing legal assistance to inmates will overburden the court system is contradicted by the Fourth Circuit's recognition that legal assistance, unlike access to libraries, can result in mediation and resolution of complaints that would otherwise burden the courts. *See Smith v. Bounds*, 813 F.2d 1299, 1302 (4th Cir.1987).

mitted to the sound discretion of the trial court. We should not substitute our judgment for that of the trial court under such circumstances. I fear that is what my colleagues in the majority have done.

I concur in part and dissent in part.