986 F.2d 1431
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Tony Calvin TSOSIE, Defendant-Appellant.
 No. 92-2103.
 United States Court of Appeals, Tenth Circuit.
 Feb. 8, 1993.
 
 Before McKAY, Chief Judge, and JOHN P. MOORE and STEPHEN H. ANDERSON, Circuit Judges.
 ORDER AND JUDGMENT*
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 Tony Calvin Tsosie was convicted of one count of aggravated sexual abuse in violation of 18 U.S.C. §§ 1153, 2241(c), and 2245(2)(A) and (C). The district court sentenced him to 168 months' imprisonment and 3 years of supervised release. The defendant raises three issues in this direct appeal: (1) whether the trial court's limitation of the defendant's cross-examination of a witness violated his Sixth Amendment rights or was otherwise improper; (2) whether the government provided sufficient evidence to convict; and (3) whether the trial court's exclusion of polygraph evidence violated his Fifth and Sixth Amendment rights. We conclude the district court abused its discretion in limiting cross-examination on a critical issue and reverse for a new trial. In anticipation of the recurrence of the issue, we hold the trial court did not err in denying the use of polygraph evidence. We also conclude the evidence was sufficient for conviction.
 
 
 2
 Cecelia Caesar left her five-year-old daughter, Julia, at her cousin's home where Julia was to play with Travis, one of the children living there. After Ms. Caesar left, defendant hailed to Julia from the house and asked her to come inside. When the child entered, defendant called her to him, picked her up, and laid her on a couch. Defendant then pulled down her shorts and underwear and, according to Julia, "put his whole hand in my private part." When the defendant stopped, he pulled up her shorts, told her not to cry, and said he would buy her some candy.
 
 
 3
 Julia then went outside, found Travis, and told him the defendant had touched her. She later saw her nine-year-old brother, Conan, ran up to him, grabbed his arm, and told him defendant touched her. Conan said Julia appeared frightened, so he told her to tell their mother. When their mother arrived, Conan saw Julia run toward her.
 
 
 4
 Ms. Caesar testified when she returned to the house, Julia ran to her crying, and said, "Tony hurt me." Ms. Caesar asked Julia who Tony was, and Julia pointed to the defendant who was standing outside the house. Ms. Caesar approached the defendant and asked what he had done to Julia. He replied he had not seen Julia all day and did not do anything to her. Julia told her mother the defendant was lying.
 
 
 5
 After this exchange, Ms. Caesar left with Conan and Julia. They drove to Shiprock, New Mexico, to report the incident to the Shiprock Tribal Police. After talking to the police, Ms. Caesar took Julia to the Shiprock Indian Health Services Hospital for an examination.
 
 
 6
 Dr. Martin Nygaard, Chief of Pediatrics at the Shiprock Indian Health Services Hospital, examined Julia shortly after the incident. Dr. Nygaard testified Julia told him "he pulled my pants down and he stuck his finger in my butt." When he attempted to clarify what she meant by "butt," she pointed to her vaginal area. He examined Julia and discovered an area of redness, two millimeters in diameter, inside the vaginal opening. He did not observe tears, lacerations, or bleeding in the genital area, but he stated it is possible to have digital penetration with no tears or bleeding.
 
 
 7
 Dr. Nygaard testified the redness he noticed was consistent with Julia's story of sexual assault. However, he also stated this was a nonspecific finding, meaning the redness could have resulted from other causes. Finally, he stated Julia's genital opening was not big enough for a man's hand; and, "if she had told me that he had placed his entire hand in the opening, in that small opening, it would have changed the way I looked at it."
 
 
 8
 On direct examination, Ms. Caesar testified that after the incident Julia began wetting the bed and having nightmares. On cross-examination, defense counsel asked whether Ms. Caesar loved her daughter and was upset over her daughter's report of the attack. Then he asked, "[D]uring this same general time period you were getting divorced from your husband, is that right?"[1] The government objected, and in an ensuing bench conference defense counsel argued:
 
 
 9
 Judge, the government provided some medical reports to me and in those reports it states that, one, they were in the process of a divorce; and, two, that the child had witnessed domestic violence, fighting between the mother and father, and I think that is a legitimate reason to state other reasons why she may have been having bed wetting problems, nightmares.
 
 
 10
 Counsel then stated he "would like to ask if [Julia] witnessed that" because he thought it was "reasonable to argue to the jury."[2] The trial court responded:
 
 
 11
 I think if it is relevant ... it is way out on the fringes of relevance, and if it is relevant I'm not going to allow it on 403 grounds. I think the probative value is greatly outweighed by the possible confusion of the issues and possible prejudice. Objection will be sustained.
 
 
 12
 After this conference, defense counsel did not ask Ms. Caesar or any other witness about Julia's bed wetting and nightmares.
 
 
 13
 During closing argument, the government reminded the jury Ms. Caesar had testified about changes in Julia's behavior, stating:
 
 
 14
 [T]o moms this is significant. And mom is somebody who is with her child all the time, and she knows when there's--something, some major change in her child's life that results in these major changes in behavior. Hadn't been bed [wetting] before, now starting to happen. Starting to have nightmares. Also highly corroborative.
 
 
 15
 The defendant makes two arguments concerning the trial court's refusal to allow him to question Ms. Caesar regarding her divorce and whether Julia witnessed violence between Ms. Caesar and her husband. First, the defendant contends the trial court's ruling precluded his inquiry into an entire area of relevant cross-examination, thus infringing upon his Sixth Amendment right of confrontation. See United States v. Valentine, 706 F.2d 282, 287-88 (10th Cir.1983) (defendant's right to confrontation may be violated if court precludes an entire area of relevant cross-examination). " 'A constitutional violation occurs only when the defendant is prohibited from engaging in "otherwise appropriate cross-examination" and thereby prevented from exposing facts from which jurors "could appropriately draw inferences relating to the reliability of the witness." ' " United States v. Ellzey, 936 F.2d 492, 496 (10th Cir.) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974))), cert. denied, 112 S.Ct. 400 (1991). The court reviews Confrontation Clause claims de novo. Id. at 495.
 
 
 16
 Alternatively, if the ruling did not constitute a Sixth Amendment violation, defendant argues the trial court erred in limiting the extent of cross-examination. "[T]his is a matter of the trial judge's discretion and will not lead to reversal unless an abuse of discretion, clearly prejudicial to the defendant, is shown." Valentine, 706 F.2d at 288. The trial judge has broad discretion to limit cross-examination based on concerns about prejudice, harassment, and confusion of the issues. Ellzey, 936 F.2d at 496 (quoting Van Arsdall, 475 U.S. at 679). Here, the trial court ruled the probative value of questions concerning whether Ms. Caesar was divorcing her husband and whether Julia witnessed domestic violence was outweighed by possible prejudice and confusion of the issues.
 
 
 17
 We start from the premise that the government opened the area of bed wetting and nightmares and their significance on direct examination, and, therefore, cross-examination on this area was appropriate. See United States v. Drake, 932 F.2d 861, 866 (10th Cir.1991) (direct examination on an area opens it to cross-examination). While this evidence was appropriately used to corroborate Julia's testimony, the trial court's ruling deprived the defense of its only practical opportunity to explore whether there were causes of Julia's bed wetting and nightmares other than the assault allegedly committed upon her. This denial left unchallenged the government's attempt to buttress the testimony of its key witness.
 
 
 18
 The government argues the ruling did not preclude the defendant from obtaining similar evidence from other sources. The prosecution maintains the ruling merely precluded the defendant from asking questions about Ms. Caesar's marital problems. We would agree, but the argument does not assuage the total impact of the ruling. Although it did not result in a Sixth Amendment violation, it did have a detrimental effect on the trial.
 
 
 19
 The defense had a concrete basis for believing the marital difficulties between Julia's parents were serious potential causes of the child's behavioral changes. Moreover, it is not beyond reason to believe witnessing violence between her parents coupled with the attendant loss of her father's companionship through the divorce could produce an alteration of the child's behavior.
 
 
 20
 In the context of this trial, only Ms. Caesar could have testified whether the acts of violence had occurred and whether the child had witnessed them. Thus, while counsel was not prevented from establishing other pertinent circumstances through different witnesses, the district court improperly curtailed appropriate and critical cross-examination.
 
 
 21
 We believe the court's conclusion that cross-examination would have been confusing to the jury resulted from a mistaken reading of the purpose behind the line of questioning. The defense was not trying to inject extraneous facts into evidence, but to legitimately attack the government's effort to provide substantial support to its key witness. Rather than confuse the jury, the testimony could have given it a validly contested matter of fact to resolve.
 
 
 22
 Under the circumstances, depriving the defense of the opportunity to explore this important avenue was an abuse of discretion. Although led to the erroneous conclusion by the government's misdirected objection, the effect of the court's ruling leads us to conclude the defendant must be given another trial. Because other issues raised may have bearing on the outcome of that trial, our inquiry cannot end here, however.
 
 
 23
 We have reviewed the record and conclude the evidence was sufficient to support the defendant's conviction. "A conviction can constitutionally stand only if, after viewing all of the evidence presented at the trial in the light most favorable to the prosecution, any rational trier-of-fact could have found the essential elements of the crime charged beyond a reasonable doubt." Beachum v. Tansy, 903 F.2d 1321, 1332 (10th Cir.) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)), cert. denied, 111 S.Ct. 269 (1990).
 
 
 24
 In this case, the government's burden was to establish that there had been penetration, however slight, of the victim's genital opening by a hand or finger, done with an intent to abuse, humiliate, harass, or degrade the victim, or arouse or gratify the defendant's sexual desires. 18 U.S.C. §§ 2241(c) and 2245(2)(C) and (3). The essential elements of the crime were established by Julia's testimony. Defendant's attempt to discredit this testimony merely goes to its weight and not to a deficiency in the elements of proof.
 
 
 25
 Defendant next argues the trial court's exclusion of his polygraph evidence violated his right to due process and a fair trial. This court reviews the trial court's admissibility decision under the abuse of discretion standard. United States v. Hall, 805 F.2d 1410, 1417 (10th Cir.1986).
 
 
 26
 The defendant asserts Ms. Caesar's testimony that Julia said he was lying was an attack on his credibility. He "would have used the evidence that he had passed a polygraph examination to rebut the government's direct and preceding evidence that ... the defendant lied when he denied sexually abusing or assaulting [Julia]." Under Hall, defendant argues, the fact he passed a polygraph examination is admissible to rebut the government's attack on his credibility.
 
 
 27
 In Hall, the court admitted evidence the defendant had taken and failed two polygraph tests. Prior to the trial, the court warned the defendant that if he sought to impugn the quality of the government's investigation, the court would allow a detective to testify that she considered a full investigation unnecessary because the defendant had failed two polygraph examinations. During cross-examination of the detective, the defendant raised the issue of the investigation's quality, and, on redirect, the court allowed the detective to explain she narrowed the investigation to the defendant because he failed two polygraph examinations. Id. at 1415.
 
 
 28
 "In this Circuit, polygraphs are not admissible to show that one is truthful. This is so because of the belief that the reliability of such tests is yet in doubt, although it has been noted that, in a proper case, the evidence might be admissible." Id. at 1416 (citations omitted). While there have been circumstances which have led other circuits to allow polygraph evidence for limited purposes, United States v. Kampiles, 609 F.2d 1233, 1244 (7th Cir.1979) ("party offering the evidence was not asserting the accuracy of the test results"), cert. denied, 446 U.S. 954 (1980); Tyler v. United States, 193 F.2d 24, 31 (D.C.Cir.1951) (to show circumstances leading to a confession to rebut charges of coercion), cert. denied, 343 U.S. 908 (1952), this case does not fall within their shadow.
 
 
 29
 Although defendant attempts to establish this case is one of those "proper cases" where polygraph evidence comes in as rebuttal evidence, his effort falls short. While he argues he wanted to use the evidence to rebut the testimony that he was lying, the substance of his effort was simply to show he was truthful. This falls squarely within Hall's holding polygraphs are not admissible to show truthfulness.
 
 
 30
 Moreover, the cases the defendant cites do not bolster his argument. See Toussaint v. McCarthy, 926 F.2d 800, 802-03 (9th Cir.1990) (prison officials may use polygraph evidence to determine if prisoners have given up gang affiliation and are eligible for release from segregation), cert. denied, 112 S.Ct. 213 (1991); United States v. Miller, 874 F.2d 1255, 1261 (9th Cir.1989) (polygraph evidence might be admissible for a limited purpose unrelated to the substantive correctness of the results of the polygraph examination) (citing Brown v. Darcy, 783 F.2d 1389, 1397 (9th Cir.1986)); United States v. Piccinonna, 885 F.2d 1529, 1535-37 (11th Cir.1989) (en banc) (revisiting issue of admissibility of polygraph evidence and setting standards for admissibility). The trial court did not err in refusing the testimony.
 
 
 31
 The judgment of the district court is AFFIRMED IN PART AND REVERSED IN PART. The case is REMANDED FOR A NEW TRIAL in accordance with the provisions of this order and judgment.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 During opening argument, defense counsel stated, without objection, "[t]he evidence will show that Julia Caesar's parents were in the process of divorcing. She [Julia] had lost her father. Evidence shows that she had watched her parents involved in domestic violence and watched her father hurt her mother."
 
 
 [2]
 On cross-examination, Julia had stated that her father had left their home around the time this happened, and she was sad about his leaving